Chief Judge Fuld.
 

 The Legislature has provided, in subdivision 1 of section 592 of the Labor Law, that employees who lose their employment because of a strike will not be paid unemployment benefits for a period of seven weeks, even though they took no part in that strike, if it occurred in the “ establishment ” in which they worked. Insofar as pertinent, subdivision 1 provides:
 

 " The accumulation of benefit rights by a claimant shall be suspended during a period of seven consecutive weeks beginning with the day after he lost his employment because of a strike, lockout, or other industrial controversy in the establishment in which he was employed ’ ’.
 

 In the case before us, the claimants-appellants were employed by General Mills in various buildings in its plant in Buffalo, New York . A strike by longshoremen in the plant’s grain elevators resulted in the claimants’ loss of employment. Maintaining that that strike took place in an “ establishment ” other than the one where they were employed, the claimants insisted that they were not subject to the suspension of benefits provided for by the statute.
 
 [1]
 
 The Unemployment Insurance Appeal Board, sustaining a decision of the Industrial Commissioner in the claimants’ favor, determined that they were entitled to benefits from the first day on which they lost their employment. On appeal, the Appellate Division reversed and dismissed the claims.
 

 The employer respondent General Mills is a manufacturer of flour, cereals and other wheat products from the raw wheat grain. It operates a complex of grain elevators, flour and cereal mills and packaged food plants connected by overhead bridges in an area lying between the City Ship Canal and the Buffalo River and broken up by railroad tracks and public thorough
 
 *678
 
 fares. Wheat, received from ships and railroad cars and stored and blended in the two grain elevators, is transported in the overhead bridges to other storage areas and to the several mills and plants. Originally, the elevators had been owned and operated by several corporations having nothing to do with the manufacture of wheat products. They supplied grain to the mill but, as one witness noted, “ [historically they were separate establishments.” There was ample evidence before the board to justify its conclusion that those elevators were separated from the other buildings not only by substantial distances but by railroad tracks and public thoroughfares.
 
 [2]
 

 On March 25, 1963, in protest against the layoff of several of their fellows, all of the employer’s longshoremen, who work in the grain elevators, engaged in a wildcat strike. As a result of that strike, General Mills was unable to transfer grain from the elevators to other parts of its plant and was compelled, within a few days ’ time, to lay off a large number of employees, including the claimants, who worked in its flour and cereal mills, packaged food plants and other buildings. Although there were only some 40 strikers, about 315 nonstrikers were affected by the work stoppage; the remaining 500 employees continued to work. The strike was settled on April 24.
 

 The longshoremen, who are represented by Local 1286, International Longshoremen’s Association, perform all of their work in the grain elevators except that once a day a longshoreman goes to “ measure grain ” in the storage tanks. The contacts between the longshoremen and the mill workers are minimal. The two sets of employees belong to different unions, the longshoremen, as noted, to a local of the International Longshoremen’s Association and the other employees to Local 36 of the
 
 *679
 
 American Federation of Grain Millers. Each union has different agreements with respect to wages, hours and working conditions. There is no interchange of personnel, the longshoremen being hired through the union or its hiring hall and the other employees from the street. The elevators and the mills have separate superintendents, and there are separate health, welfare and pensions plans. On the other hand, it should be noted, there are certain common facilities which serve both, such as the powerhouse, cafeteria, medical office, supply and storeroom offices, machine shop, personnel and payroll office and purchasing office.
 

 Equating the word “ establishment ” with “ place ” rather than “ enterprise ” — in accordance with our decision in
 
 Matter of Ferrara
 
 (Catherwood) (10 N Y 2d 1) —the Unemployment Insurance Appeal Board made a finding that the grain elevators constituted an establishment, separate and distinct from the various mills and packaging plants spread over the area. Therefore, the board concluded, since the claimants were not employed in the establishment in which the strike occurred, they were not subject to the seven-week suspension of benefits.
 

 Section 623 of the Labor Law, insofar as pertinent, recites that a 1 ‘ decision of the appeal board shall be final on all questions of fact and, unless appealed from, shall be final on all questions of law.” Accordingly, our task is simply to decide whether there was substantial evidence to sustain the board’s determination and not whether there was evidence to support the Appellate Division’s contrary decision. An appellate court may upset the determination of the Appeal Board only if it may be said, as matter of law, that the claimants were employed in the same establishment as the striking longshoremen. In the present case, it is clear, the board’s determination is supported by substantial evidence and must be upheld.
 

 In
 
 Matter of Ferrara (Catherwood)
 
 (10 N Y 2d 1, supra), striking clerks of the National Airlines office at Idlewild caused a layoff of the company’s mechanics in the Idlewild hangar and of its clerks who had been working in Manhattan. This court upheld the determination of the Appeal Board—confirmed by the Appellate Division — that the strikers and the other two sets of workers were not employed in the same establishment and that the latter were entitled to unemployment insurance bene
 
 *680
 
 fits. In so doing, the court ruled that the word 11 establishment ’ ’ in the statute (§ 592, subd. 1) was to be equated with “ place or situs ” rather than given “ an all-encompassing meaning equated with
 
 ‘
 
 enterprise ’ ” (pp. 7, 8) and, consequently, was to be “ defined in geographic terms rather than in terms of corporate organization or exercise of management powers and functions ’ ’ (p. 8) .
 
 [3]
 

 Applying this principle to the facts of the case now before us, it certainly may not be said, as a matter of law, that the two grain elevators, which received wheat from ships and railroad cars for initial storing and blending, are located in the same 1 ‘ place or situs ’ ’ as the mills and processing and packaging plants —• which, as already noted, are sprawled over a wide area —■ and, hence, that they constitute the same establishment. The elevators are removed by up to 400 feet from the mills and processing buildings and variously separated from them by three or four sets of tracks of a railroad spur, by another nine sets of railroad tracks and by public streets. Their geographic separateness is further emphasized by the fact that the grain elevators were originally owned and operated for many years by commercial elevator companies completely separate and apart from the mill until General Mills, the holding company, ultimately acquired all of the various outfits. In addition, other than the fact that one longshoreman went daily to the two mill tanks —• with which nonstriking employees had some contacts —■ to measure grain, there were no working relations whatsoever between the striking and nonstriking employees.
 

 All in all, the Appeal Board’s finding of a separate “ establishment ” was fully warranted by the geographic location of the elevators. Moreover, such a conclusion better accords with the legislative design of the statute and the construction which •this court has placed upon it than does the Appellate Division’s contrary holding. The suspension provision should be “ narrowly construed ”, we declared in
 
 Ferrara,
 
 “ to effectuate the broad humanitarian objectives sought to be achieved” and this, we added, is best done by defining ‘ ‘ establishment ’ ’
 
 *681
 
 in “ geographic terms ” (10 N Y 2d, at p. 8).
 
 [4]
 
 Unemployment insurance provisions were intended to protect workers who lost their employment through no fault of their own. Striking employees, the court continued, were excepted from coverage for a seven-week period in the “ interest of preserving [governmental] neutrality between a contesting employer and employees and irrespective of individual need * * *. The State must stand aside, at least during the early stages of an industrial controversy, and thereby avoid the imputation that a dispute may be financed through unemployment insurance benefits ” (10 N Y 2d, at p. 8; see, also,
 
 Matter of Heitzenrater [Hooker Chem.
 
 Corp.], 19 N Y 2d 1, 7). Nonstriking employees in the same “ establishment ” with the strikers were similarly excepted, presumably either to prevent collusion between strikers and those who, by reason of their close proximity, might be in a position to gain from a strike or to induce the non-strikers to bring pressure to bear on their striking coworkers to terminate the strike. Be that as it may, a restricted construction of the term ‘ ‘ establishment ’ ’ to apply to the immediate • geographic situs of the striking employees goes far toward preventing the harmful effects of a loss of employment benefits upon innocent and uninvolved employees.
 

 The employer relies heavily upon our determination in
 
 Matter of George
 
 (Catherwood) (14 N Y 2d 234). It is true that the Appellate Division and our court there concluded that the General Motors motor plant, forge and foundry at Tonawanda constituted one establishment but what is significant and decisive is the fact that the Appeal Board had so found, and the courts had no alternative but to uphold that determination since there was substantial evidence to support it.
 
 [5]
 
 Whether
 
 *682
 
 the board’s determination in the case before us is at odds with its conclusion in
 
 George
 
 is beside the point. It is enough to observe that in cases in which administrative agencies arrive at variant results on seemingly identical fact situations, the courts are under the necessity of confirming both determinations if evidence is at hand to support them. Likewise, in the present case, the Appeal Board’s determination must be confirmed, since it is supported by substantial evidence that the nonstrikers were employed in an establishment separate and apart from that in which the strikers worked.
 

 The order appealed from should be reversed, with costs in this court and in the Appellate Division, and the determination of the Unemployment Insurance Appeal Board reinstated.
 

 Judges Burke, Bergan and Breitel concur with Chief Judge Fuld ; Judges Soileppi and Jasen dissent and vote to affirm on the opinion at the Appellate Division; Judge Keating taking no part.
 

 Order reversed, with costs in this court and in the Appellate Division, and matter remitted to the Appellate Division for further proceedings in accordance with the opinion herein.
 

 [1]
 

 . The present claimants were “selected as representative” of about 315 employees who filed similar claims for benefits.
 

 [2]
 

 . More specifically, the buildings in which the nonstriking employees worked are separated from the elevators by distances of anywhere from 60 or 120 to 400 feet. Indeed, (1) the warehouse and cereal plants are separated from the elevator closest to them by nine sets of railroad tracks and a public street, (2) a cereal mill is separated by railroad tracks, a public street and several high buildings and (3) a flour mill by a railroad siding of three or four sets of tracks. Although it is true, as the employer points out, that a portion of the north wall of one building (the Utility Building) is formed by the storage tanks of one of the elevators, the record contains no evidence that any of the nonstriking employees who were laid off performed services in the Utility Building.
 

 [3]
 

 . The Appellate Division expressed the same thought in
 
 Ferrara
 
 (11 A D 2d 171, 173) by stating that the Legislature “ did not mean by ‘ establishment ’ the whole compass of a large employer’s business institution where it operates in differently localized components.”
 

 [4]
 

 . Such a construction also makes for ease of administration. Again, to cull from our opinion in
 
 Ferrara,
 
 the
 
 “
 
 geographic concept of 1 establishment ’, looking only to concrete facts, better fits the legislative purpose of simplicity of administration ” and ease of understanding by both employee and employer, than one which would require
 
 “
 
 complex or abstract administrative determina- " tions ” with reference to
 
 “
 
 individual involvement, participation or interest ” (10 N Y 2d, at pp. 8-9).
 

 [5]
 

 . As a matter of fact, this aspect of the
 
 George
 
 case (14 N Y 2d 234,
 
 supra)
 
 was a subsidiary one, the principal question decided being that General Motor operations as far apart as Buffalo, Tonawanda and Loekport constituted separate establishments. In reaching that conclusion, this court actually reinstated the determination of the Appeal Board and reversed so much of the Appellate Division’s decision as held that they constituted a single establishment.